JoNes, Chief Judge,
delivered the opinion of the court:
Plaintiff sues to recover freight charges allegedly due on 377 carload shipments of coal transported for defendant during the wartime period from July 15, 1913, to, March 16, 1945, from various points in Canada to Benton, Washington. Defendant counterclaims for sums allegedly overpaid.
The sole question is the defendant’s entitlement to reduced rates by virtue of the land-grant equalization agreement entered into by plaintiff. If the defendant be so entitled, it must recover $26.15 on its counterclaim; if not, plaintiff must recover $17,315.71, the difference between its share of the unreduced freight rate and the sums already paid by defendant.[1]
The shipments in question, all originating in Canada, moved over one or the other of the following two rail routes:
*169 (1) Canadian Pacific Railway Company from origin to Sapperton, British. Columbia; Vancouver, Victoria & Eastern Railway & Navigation Company, a subsidiary or component line of Great Northern Railway Company, from Sapperton, British Columbia, to Blaine, Washington; Great Northern Railway Company from Blaine to Seattle, Washington; and Pacific Coast Railroad Company from Seattle to Renton, Washington;
(2) Canadian Pacific Railway Company from origin to Sumas, Washington; Northern Pacific Railway Company from Sumas to Seattle, Washington; and Pacific Coast Railroad Company from Seattle to Renton, Washington.
Plaintiff during all of the period of these shipments was party to the standard freight land-grant equalization agreement. This agreement provided that, subject to certain conditions and exceptions, plaintiff was to apply on Government traffic a reduced rate, which was to be no higher than the net rate applicable over competitive land-grant routes.[2] The purpose of such equalization agreements was to enable carriers over non-land-grant routes (and both of the routes here involved were wholly non-land-grant) to compete with land-grant carriers by offering comparably low freight rates.
The equalization agreement to which plaintiff was a party provided specifically, in pertinent part, as follows: .
Freight Land-Grant Equalization Agreement, 'paragraph j¡.:
The carriers shown herein as parties to agreement, agree, subject to the conditions and exceptions stated below, to accept for the transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, the lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State commissions *170 applying from point of origin to destination at time of movement.
CONDITIONS:
(a) On traffic destined to and/or received from points on lines of other carriers this agreement will only apply in connection with such carriers as have an agreement of the form stated above on file with the Chief of Transportation, War Department, Washington, D.C., except as otherwise provided under the heading of “Except-tions” below.
(b) On traffic destined to and/or received from points on lines of other carriers this agreement is subject also to the exceptions in the agreements of each individual carrier forming part of the through route of movement, on file with the Chief of Transportation, War Department, Washington, D.C., except as may be otherwise provided under the heading of “Exceptions” below.
* * * * *

Exception %7:

On traffic moving in connection with initial line-haul railroads and/or last line-haul railroads, other than those carriers enumerated in Exception 7, who do not have freight land-grant equalization agreements on file with the Chief of Transportation, War Department, Washington, D.C., the provisions of Condition (a) in paragraph 4 above are hereby waived with respect to such initial line-haul railroads and/or last line-haul railroads: Provided, That if other agreement carriers form part of the through route of movement each agreement carrier shall have this exception in its freight land-grant equalization agreement on file with the Chief of Transportation, War Department, Washington, D.C.
The Canadian Pacific Bailway Company, the initial connecting carrier on all these shipments, was also party to a land-grant equalization agreement during all of this same period. This agreement provided, in pertinent part, as follows:
1. The Canadian Pacific Bailway Company, on traffic ■between points of origin and destinations, both of which are in the United States, hereinafter called this carrier, hereby agrees, subject to the conditions and exceptions stated below, to accept for transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to. reduced rates over land- *171 grant roads, tbe lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State Commissions applying from point of origin to destination at time of movement.
The issue presented is whether the reduced rates provided in plaintiff’s equalization agreement are available to defendant on these shipments; specifically, whether these rates are rendered inapplicable by virtue of the Conditions which are a part of that agreement.
It is evident from the terms of its agreement that Canadian Pacific cannot be held to the reduced rates on shipments, such as these, which originate in Canada. Notwithstanding this, howeyer, under defendant’s theory of the case the plaintiff, Great Northern, and Northern Pacific would nonetheless be held to absorption of the reduction not only on their own respective portions of the routes but also on that major portion over which Canadian Pacific was the carrier. They would be required to absorb the reduction for the entire length of the shipment, even though they would be paid only for the relatively minor portion of the shipment which was over their lines.
The effect of this upon plaintiff would be to reduce the rates to be paid to it to a level which is manifestly inadequate.
The intent to permit such a result should not be inferred unless no other reasonable construction of plaintiff’s agreement would be justified. We find, however, not only that such a reasonable construction is possible, but in the light of the entire record it is the only logical interpretation.
We hold that the effect of Condition (b) is to render the equalized rates inapplicable to these shipments. We therefore find it unnecessary to pass upon the effect of Condition (a).
Condition (b) of plaintiff’s agreement, quoted above, provides that such agreement is “subject also to the exceptions in the agreements of each individual carrier forming part of the through route of movement, * * The Canadian Pacific Bailway Company, in all instances here the initial carrier, was clearly a carrier forming part of that through route of movement. Plaintiff’s agreement is therefore sub *172 ject to that provision in the Canadian Pacific Company’s agreement, likewise quoted above, which states that the reduced rates therein established are applicable only “on traffic between points of origin and destinations, both of which are in the United States.” All of the traffic here involved had as its points of origin locations not in the United States, but in Canada. We, therefore, conclude that the reduced rates provided in plaintiff’s land-grant equalization agreement are inapplicable to the shipments in question.
It is apparent that Condition (b) was intended to prevent that situation where some of the carriers would be required to sustain all of the agreed reductions because of a provision in the agreement of one of the carriers either rendering the reduced rates inapplicable to it or otherwise modifying their effect. In the instant case, it is indisputable that the reduced rates are inapplicable to Canadian Pacific. Absent this Condition, however, plaintiff and those other connecting carriers which are parties to agreements such as plaintiff’s might nonetheless be held to the reduced rates and be required to bear the whole of those reductions.[3] It is clear that Condition (b) renders plaintiff’s agreement subject to any provision in the equalization agreement of a connecting carrier, whether or not specifically denominated an “Exception,” which has the effect of carving out an exception to the application of the latter agreement.
Accordingly, judgment is entered for plaintiff for $17,315.71, the amount of freight charges yet due on these shipments and withheld by defendant. Defendant’s counterclaim for sums overpaid is dismissed, since it follows that no overpayments have occurred.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Pacific Coast Bailroad Company, is a corporation organized and existing under the laws of the State *173 of Washington and is a common carrier by railroad in interstate commerce over its own lines and jointly with other lines.
2. During the period July 15, 1943, through and including March 16, 1945, plaintiff and its connecting carriers transported, at defendant’s request, 377 carload shipments of coal (mine run coal, slack coal, and steam coal) from Hill-crest, Coleman, Bellevue and Blairmore, Alberta, to Kenton, Washington, where the 377 shipments were delivered to the United States Treasury Department, Procurement Division. Of these 377 shipments, 10 originated at Hillcrest, 173 at Coleman, 160 at Bellevue and 34 at Blairmore.
3. The foregoing shipments were covered and described by 377 Government bills of lading made out by defendant’s officers and, pursuant to these bills of lading, the shipments were routed and moved over the following two rail routes:
(a) Canadian Pacific Kailway Company from origin to Sapperton, British Columbia;
Vancouver, Victoria & Eastern Kailway & Navigation Company, a subsidiary or component line of Great Northern Kailway Company, from Sapperton, British Columbia, to Blaine, Washington;
Great Northern Kailway Company from Blaine to Seattle, Washington; and
Pacific Coast Kailroad Company from Seattle to Kenton, Washington.
(b) Canadian Pacific Kailway Company from origin to Sumas, Washington;
Northern Pacific Kail way Company from Sumas to Seattle, Washington; and
Pacific Coast Kailroad Company from Seattle to Kenton, Washington.
4. In order to shorten the proof in this case the parties agreed that the following shipments described by Government bill of lading numbers are representative of all shipments in suit:
(a) DATPS 423321, covering a shipment from Blair-more, Alberta, on August 7,1943;
(b) WT 267178, covering a shipment from Hillcrest, Alberta, on October 5,1943;
(c) DATPS 509477, covering a shipment from Coleman, Alberta, on October 7,1943;
(d) DATPS 511169, covering a shipment from Belle-vue, Alberta, on October 5,1943;
*174 (e) DATPS 504547, covering a shipment from Blair-more, Alberta, on September 16,1943;
(f) DATPS 50918, covering a shipment from Coleman, Alberta, on November 17,1943.
5. During the period July 15, 1943, through March 16, 1945, rail carriers receiving grants of United States Government land to aid the construction of their rail lines were obligated by statute to transport military traffic of the United States over the land-grant-aided segments of their lines at a 50-percent reduction from the proportions of the applicable tariff rates, published and filed with the Interstate Commerce Commission, accruing to these land-grant-aided segments. The rail routes between any origin and destination consisting in whole or in part of such land grants are referred to as land-grant routes. This 50-percent reduction applied only to that portion of the land-grant route constructed on Government-granted land.
6. Carriers that had not received grants of Government land, or whose grants over a particular route between an origin and destination were so small that that route would not be considered the governing or preferred route for Government traffic, entered into the so-called land-grant equalization agreement by which they promised, subject to several conditions and exceptions, to apply on Government traffic a net rate no higher than that applicable over the route between certain points which included the maximum land-grant mileage. The basic purpose of the equalization agreement was to make non-land-grant routes competitive with governing land-grant routes from the viewpoint of freight rates on Government shipments.
7. During the times of shipment involved in this lawsuit, the Pacific Coast Railroad Company, the Great Northern Railway Company and the Northern Pacific Railway Company were parties to the standard freight land-grant equalization agreement and exception 27 thereto, which provided in pertinent part as follows:
Freight Lamd-Grant Equalization Agreement, 'paragraph I¡,:
The carriers shown herein as parties to agreement, agree, subject to the conditions and exceptions stated below, to accept for the transportation of property *175 shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-
frant roads, the lowest net rates lawfully available, as erived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State commissions applying from point of origin to destination at time of movement.
CONDITIONS:
(a) On traffic destined to and/or received from points on lines of other carriers this agreement will only apply in connection with such carriers as have an agreement of the form stated above on file with the Chief of Transportation War Department, Washington, D.C., except as otherwise provided under the heading of “Exceptions” below.
(b) On traffic destined to and/or received from points on lines of other carriers this agreement is subject also to the exceptions in the agreements of each individual carrier forming part of the through route of movement, on file with the Chief of Transportation, War Department, Washington, D.C., except as may be otherwise provided under the heading of “Exceptions” below. *****

Exception 27 :

On traffic moving in connection with initial line-haul railroads and/or last line-haul railroads, other than those carriers enumerated in Exception 7, who do not have freight land-grant equalization agreements on file with the Chief of Transportation, War Department, Washington, D.C., the provisions of Condition (a) in paragraph 4 above are hereby waived with respect to such initial line-haul railroads and/or last line-haul railroads: Provided, That if other agreement carriers form part of the through route of movement each agreement carrier shall have this exception in its freight land-grant equalization agreement on file with the Chief of Transportation, War Department, Washington, D.C.
8. The routes of movement for the shipments in issue, as described in finding 8 above, were composed entirely of non-land-grant mileage, i.e., the carriers forming those routes had received no grants of Government land to aid the construction of those rail routes. The rail route from the involved Alberta origins to the destination of Renton, Washington, *176 which contained the maximum land-grant mileage and could have been used, was composed of the Canadian Pacific Railway Company to Kingsgate, British Columbia; Spokane International Railroad from Kingsgate to Spokane, Washington; Northern Pacific Railway Company from Spokane to Black River, Washington; and Pacific Coast Railroad Company from Black River to Renton. Via this route the rail mileage from Spokane to Meeker, Washington, consisted entirely of land grants.
9. During the period from July 19,1943, to March 16,1945, the Canadian Pacific, the Great Northern and its subsidiary and participating carrier Vancouver, Victoria & Eastern, the Northern Pacific and the Spokane International Railway Companies were parties to supplements 32 and 33 of Canadian Pacific Railway Company Tariff No. 217-A (I.C.C. No. 857) and later supplements and issues of that tariff. Plaintiff, Pacific Coast Railroad Company, became a party to supplement 33 of that tariff, effective September 15, 1943. The tariff and supplements 32 and 33 thereof were duly .filed and published and kept open to public inspection in accordance with section 6 of the Interstate Commerce Act during the period.
10. Supplement 32, referred to above, named a rail rate of $4.55 per net ton on coal moving from Hillcrest, Coleman, Bellevue and Blairmore, Alberta, to Seattle and Black River, Washington. This rate applied from those points to Seattle via the routes of movement described in finding 3. This rate also applied to and from those points via the maximum land-grant route described in finding 8.
11. During the period July 15,1943, to September 15,1943, the Pacific Coast Railroad Company had duly filed and published with the Interstate Commerce Commission and had kept open to public inspection Northern Pacific Coast Tariff No. 24-G (I.C.C. No. 691) naming a local rail rate of 54 cents per ton on coal from Seattle or Black River to Renton, Washington.
12. During the period September 15, 1943, to March 16, 1945, the aforesaid supplement 33 of Canadian Pacific Railway Company Tariff No. 217-A, as amended by later supplements and issues of the tariff, named a joint, single-factor *177 through rail rate of $4.80 per ton on coal from Hillcrest, Blairmore, Bellevue and Coleman, Alberta, to Renton, Washington. The single-factor through rate applied over the routes of movement described in finding 3 and on the land-grant route described in finding 8.
13. The parties agree that during the period July 15,1943, to September 15,1943, the applicable tariff rate on the shipments in suit during that period was composed of a combination rate of $4.55 per ton to Seattle or Black River, plus a local rate of 54 cents per ton from Seattle or Black River to Renton, as named in the tariffs identified in findings 9 and 11. The parties further agree that the combination rate applied both over the routes of movement for these shipments and to the governing land-grant route previously described. Plaintiff and defendant also agree that during the period September 15, 1943, to March 16, 1945, the applicable tariff rate on the shipments in suit moving during that period was the single-factor through rate of $4.80 per ton applying over the aforesaid routes of movement and (effective October 31, 1943) via the governing land-grant route.
14. Pursuant to carrier division agreements in effect at the time the involved shipments moved, the tariff rates described in findings above divided among the participating carriers as follows:
(a) Via the routes of actual movement, the combination rate of $5.09 per ton (composed of $4.55 to Seattle or Black River and 54 cents per ton from Black River or Seattle to Renton) was divided $3.4125 per ton to the Canadian Pacific for that portion of the haul from origin to Sapperton, British Columbia, and Sumas, Washington; $1.1375 per net ton to the Great Northern Railway Company (and Vancouver, Victoria & Eastern Railway & Navigation Company via Sap-perton to Seattle) or Northern Pacific via Sumas to Seattle; and 54 cents per ton to the Pacific Coast Railroad Company for its portion of the haul from Seattle to Renton.
(b) Via the governing land-grant route through Kings-gate, British Columbia, Spokane and Black River, Washington, the said combination rate of $5.09 per ton divided $2.235 per ton to the Canadian Pacific and Spokane International from origin to Spokane; $2.315 per ton to the Northern *178 Pacific from Spokane to Black River, Washington, and 54 cents per ton to the Pacific Coast for that portion of the movement from Black River to Renton.
(c) The $2,315 per ton which would have accrued to the Northern Pacific on this coal traffic (had it been routed via the governing land-grant route through Spokane) was subject to 47.470 percent statutory land-grant deduction via the Spokane route. That deduction reduced the total through rate of $5.09 per ton to a net rate, of $3.99107 per ton via that route, a total land-grant deduction of $1.10 per ton.
(d) Via the routes of actual movement, the rate of $4.80 per ton described hi finding 12 divided $3.25 per ton to the Canadian Pacific Railway Company for the portion of the movement from origin to Sapperton, British Columbia, or Sumas, Washington; $1.05 per net ton to the Great Northern Railway Company (and Vancouver, Victoria & Eastern Railway & Navigation Company) or Northern Pacific Railway Company to Seattle, Washington; and 50 cents per net ton to the Pacific Coast Railroad Company for the haul from Seattle, Washington, to Renton, Washington.
(e) Via the governing land-grant route through Kings-gate and Spokane, the rate of $4.80 per ton described in finding 12 was divided $1.12 per ton to the Canadian Pacific for that portion of the haul from origin to Kingsgate; 99 cents per ton to the Spokane International from Kings-gate to Spokane; $2.19 per ton to the Northern Pacific from Spokane to Black River; and 50 cents per ton to the Pacific Coast Railroad Company from Black River to Renton. The $2.19 per ton accruing to the Northern Pacific via the governing land-grant route from Spokane to Black River, Washington, was subject to 47.470 percent statutory land-grant deduction so that the through tariff rate of $4.80 was reduced to a net rate of $3.76041, a reduction of $1.04 on-account of land grants.
15. The Canadian Pacific Railway Company was listed as a land-grant equalization agreement carrier in routing circular No. 3 of the War Department, dated April 1, -1943, but the agreement excluded traffic originating or terminating in Canada. The land-grant equalization agreement filed by the *179 Canadian. Pacific Bailway Company on September 15,1942, states:
1. The Canadian Pacific Bailway Company, on traffic between points of origin and destinations, both of which are in the United States, hereinafter called this carrier, hereby agrees, subject to the conditions and exceptions stated below, to accept for transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, the lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State Commissions applying from point of origin to destination at time of movement.
16. During the period 1943 through December 15, 1944, on which date it was dissolved as a separate corporation by the Great Northern which owned it, the Vancouver, Victoria & Eastern Bailway & Navigation Company was not a party to any freight land-grant equalization agreement.
17. The controversy in this case is whether the carriers forming the non-land-grant routes of movement described in finding 3 and performing the transportation service herein involved are obligated under the land-grant equalization agreement to equalize and apply over the non-land-grant routes of movement the tariff rates less land-grant deduction applying via the governing land-grant route.
It is plaintiff’s position on this issue that under conditions (a) and (b) of the freight land-grant equalization agreement, quoted in finding 7, equalization of net land-grant rates via the routes of movement is precluded because the Canadian Pacific Bailway Company and the Vancouver, Victoria & Eastern Bailway & Navigation Company did not participate in absorbing a portion of the land-grant deductions and were not required to do so.
It is defendant’s position that condition (a) of the land-grant equalization agreement was waived by exception 27 of the agreement.
18. The Vancouver, Victoria & Eastern Bailway & Navi *180 gation Company participated as an “intermediate railroad” in some of the 377 shipments involved in this case. As an intermediate railroad it was not included within the term “initial line-haul railroads and/or last line-haul railroads” as used in exception 27.
DAMAGES
19. If land-grant deductions are not applicable to the shipments in suit then plaintiff is entitled to recover the amount claimed in the petition — -$17,315.71. If land-grant deductions are applicable to the shipments in suit, the petition should be dismissed and judgment entered for defendant on its counterclaim for an alleged overpayment in the sum of $26.15.
conclusion OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover $17,315.71, and it is therefore adjudged and ordered that plaintiff recover from the United States the sum of seventeen thousand three hundred fifteen dollars and seventy-one cents ($17,315.71). The court further concludes that defendant is not entitled to recover on its counterclaim, and it is therefore ordered that this counterclaim be dismissed.

 The parties are in agreement as to the amounts of damages.

 Land-grant routes are those routes on which carriers had received united States Government land to aid in the construction of their rail lines. Those carriers were required to transport Government military traffic over the land-grant-aided segments of their routes at a rate reduced 50 percent from the applicable published tariff rates.

 This situation becomes the more inequitable the greater the proportion of the through route is assigned to the carrier to whom the reduced rate is inapplicable.